UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | | |
|---|---|---|---|
| MARYJANE R., | | ) | |
| | | ) | |
| | Plaintiff, | ) | |
| | | ) | |
| | v. | ) | No. 1:21-cv-02684-SEB-MPB |
| | | ) | |
| KILOLO KIJAKAZI, | | ) | |
| | | ) | |
| | Defendant. | ) | |

**REPORT AND RECOMMENDATION ON
APPROPRIATE DISPOSITION OF THE ACTION**

Plaintiff Maryjane R. seeks judicial review of the Social Security Administration's ("SSA") decision denying her petition for Disability Insurance Benefits and Supplemental Security Income. United States District Judge Sarah Evans Barker referred this matter to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B). (Docket No. 10). Maryjane R. argues that the ALJ's rejection of the state-agency consultants' limitation to occasional handling and fingering was not supported by substantial evidence and, further, that that ALJ failed to demonstrate that 99,000 positions represented a significant number of jobs in the national economy at Step Five. For the reasons set for below, it is recommended that the Commissioner's decision denying Maryjane R. benefits be **REVERSED and REMANDED**.

**I.    BACKGROUND**

Maryjane R. applied for Disability Insurance Benefits and Supplemental Security Income on November 3, 2016, alleging disability beginning March 13, 2012. (Docket No. 8-2 at ECF p. 11). She was thirty-five years old at the time of her alleged onset and had at least a high school education. (Docket No. 8-22 at ECF p. 34). She had past relevant work as a pizza baker and a composite job as a food service manager, a pizza baker, and a material handler. (*Id.*). Maryjane

R. alleged that she was disabled by ankle problems (both), right knee problems, body numbness, pain, post-laminectomy syndrome, dysfunction in her fingers, lack of balance, and poor memory. (Docket No. 8-6 at ECF p. 12).

The SSA denied Maryjane R.'s application initially, on reconsideration, and on April 17, 2019, in a decision. (Docket No. 8-2 at ECF p. 8). In this first decision, the ALJ determined that Maryjane R. was insured for DIB through September 30, 2018; had engaged in an unsuccessful work attempt and was no longer working at the level of substantial gainful activity by the time of the hearing; had several severe impairments, but did not meet or equal a listed impairment; had the RFC to perform the full range of unskilled, sedentary work; was unable to perform past relevant work; but could perform other work that existed in significant numbers in the national economy. (Docket No. 8-2 at ECF pp. 14-26).

After the Appeals Council denied her request for review, Maryjane R. then filed a complaint in this Court. (Docket No. 8-24 at ECF p. 33, Case No. 1:20-cv-01447-MJD-SEB). On the parties' joint motion, the Court ordered a remand to the Commissioner for further administrative proceedings. (Docket No. 8-24 at ECF p. 37). The Appeals Council in turn remanded the case to the ALJ for a new hearing. (Docket No. 8-24 at ECF p. 40). Specifically, the Appeals Council ordered that the ALJ provide adequate evaluation of the treating and non-treating source opinions, fully explain which portions of the opinions were credited and how his RFC assessment was made, and seek psychological expert evidence. (Docket No. 8-24 at ECF pp. 42-43). A second hearing was held on June 2, 2021. (Docket No. 8-22 at ECF pp. 4-5). Maryjane R. was represented by an attorney and a medical expert ("ME") and a vocational expert ("VE") also appeared. (Docket No. 8-22 at ECF p. 5). The ALJ issued another unfavorable decision on June 22, 2021. (Docket No. 8-22 at ECF p. 2). Maryjane R. did not file written

exceptions, and the Appeals Council did not review the ALJ's June 2021 decision on its own.

This case was timely filed. This Court has jurisdiction under 42 U.S.C. §§ 405(g), 1383(c).

In his decision, the ALJ followed the five-step sequential evaluation in 20 C.F.R. § 404.1520(a) and 416.920(a) and concluded that Maryjane R. was not disabled. (Docket No. 8-22 at ECF pp. 5-36). Specifically, the ALJ found that:

- At Step One, Maryjane R. had engaged in substantial gainful activity in the second quarter of 2016, the fourth quarter of 2019, and the first quarter of 2020 (20 C.F.R. § 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*), but the remainder of her earnings were below substantial gainful activity levels and the claimant also had no reported earnings in 2017 and 2018; as such, there had been a continuous 12-month period during which the claimant did not engage in substantial gainful activity. (*Id.* at ECF pp. 8-9).

- At Step Two, Maryjane R. had "the following severe impairments: obesity; mild degenerative disc disease of the lumbar spine with disc bulge; mild degenerative disc disease of the cervical spine; disc protrusion at the T8-T9 level and hypertrophy at the T9-T10 level, without significant spinal canal or neuroforaminal stenosis; intramedullary lesion in the spinal cord starting at the C6-7 level and extending down the mid body of the T2 (status post C6-T2 laminectomy surgery with fusion and resection of the arachnoid adhesion); bilateral C8 radiculopathy; osteoarthritis of the right knee; mild carpal tunnel syndrome of the bilateral hands; major depressive disorder (recurrent, moderate); and unspecified personality disorder with borderline features (20 C.F.R. §§ 404.1520(c) and 416.920(c)). (*Id.* at ECF p. 9).

- At Step Three, Maryjane R. did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (*Id.* at ECF pp. 11-18).

- After Step Three but before Step Four, Maryjane R. had the residual functional capacity ("RFC") "to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant can never climb ladders, ropes, or scaffolds or crawl; the claimant can occasionally perform all other postural activities; the claimant requires the ability to alternate between sitting and standing at the work station, not more frequently than every 30 minutes; the claimant can only frequently handle and finger with the bilateral upper extremities; the claimant can only occasionally have concentrated exposure to vibration, unprotected heights, and dangerous moving machinery; the claimant is limited to work involving only simple, routine, and repetitive tasks, involving only simple work related decisions, with few, if any, work place changes; the work should require quota based tasks as opposed to production requirements; the claimant can have only occasional

contact with supervisors; the claimant can have only incidental contact with coworkers (and she cannot engaged in tandem tasks); and the claimant cannot perform jobs that involve contact with the public. (*Id.* at ECF p. 18).

- At Step Four, Maryjane R. was unable to perform any past relevant work. (*Id.* at ECF p. 30).

- At Step Five, considering Maryjane R.'s "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform," including office clerk, sorter, and packer. (*Id.* at ECF pp. 34-35).

## II.    APPLICABLE LAW

"The Social Security Act authorizes payment of disability insurance benefits . . . to individuals with disabilities." *Barnhart v. Walton*, 535 U.S. 212, 214 (2002). "The statutory definition of 'disability' has two parts." *Id.* at 217. First, it requires an inability to engage in any substantial gainful activity. *Id.* And second, it requires a physical or mental impairment that explains the inability and "has lasted or can be expected to last . . . not less than 12 months." *Id.* "The standard for disability claims under the Social Security Act is stringent." *Williams-Overstreet v. Astrue*, 364 F. App'x 271, 274 (7th Cir. 2010). "Even claimants with substantial impairments are not necessarily entitled to benefits, which are paid for by taxes, including taxes paid by those who work despite serious physical or mental impairments and for whom working is difficult and painful." *Id.*

When an applicant seeks judicial review, the Court's role is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence supports the ALJ's decision. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* In evaluating the evidence, the Court gives the ALJ's credibility determinations "considerable

deference," overturning them only if they are "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006).

The ALJ must apply the five-step inquiry set forth in 20 C.F.R. § 404.1520(a)(4)(i)-(v), evaluating in sequence:

> (1) Whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner]; (4) whether the claimant can perform h[er] past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2008). "If a claimant satisfies steps one, two, and three, [she] will automatically be found disabled. If a claimant satisfies steps one and two, but not three, then [she] must satisfy step four. Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy." *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

After Step Three, but before Step Four, the ALJ must determine a claimant's RFC by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). In doing so, the ALJ "may not dismiss a line of evidence contrary to the ruling." *Id.* The ALJ uses the RFC at Step Four to determine whether the claimant can perform her own past relevant work and, if not, at Step Five to determine whether the claimant can perform other work. *See* 20 C.F.R. § 404.1520(e), (g). The burden of proof is on the claimant for Steps One through Four, but shifts to the Commissioner at Step Five. *See Clifford*, 227 F.3d at 868.

If the ALJ committed no legal error and substantial evidence supports the ALJ's decision, the Court must affirm the benefit denial. *Barnett*, 381 F.3d at 668. When an ALJ's decision is not supported by substantial evidence, a remand for further proceedings is typically appropriate.

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005). An award of benefits "is appropriate only where all factual issues have been resolved and the record can yield but one supportable conclusion." *Id.* (citation omitted).

### III. FACTUAL BACKGROUND

Maryjane R. raises two errors. First, she argues that the ALJ erred by rejecting a limitation to occasional handling and fingering, opined by the state agency consultants, without providing an adequate articulation of how those opinions were weighed. Second, she argues that the ALJ failed to meet his burden to demonstrate that 99,000 positions represented a significant number of jobs in the national economy. The Court limits the discussion of the relevant evidence to these two issues.

#### A.  Medical Evidence

A November 13, 2013, MRI of Maryjane R.'s cervical spine demonstrated an intramedullary lesion extending from C7 through T2 and mild degenerative changes with mild to moderate narrowing of the central spinal canal at C5-6. (Docket No. 8-8 at ECF pp. 3-4). On December 19, 2013, Maryjane R. presented to neurosurgeon Robert Sloan, Jr., M.D., with complaints of headaches, bilateral arm numbness, weakness, and a burning sensation. (Docket No. 8-10 at ECF p. 25). A repeat MRI on February 20, 2014, reconfirmed the intramedullary lesion, although concluded that the cervical spine "looks essentially unremarkable" despite the presence of a minimal annular bulge at C5-6. (Docket No. 8-10 at ECF pp. 23-24). On that same date, Maryjane R. again presented to Dr. Sloan and reported "resolution of the pins and needles sensation in her hands" since starting Neurontin, although she still had "some numbness in the hands which has not worsened." (Docket No. 8-10 at ECF p. 25). Reflexes were slightly reduced,

and she had a minimally positive Hoffman's sign (abnormal movement of thumb and forefinger due to cervical spine abnormality). (Docket No. 8-10 at ECF p. 26).

Thereafter, Maryjane R.'s upper extremities developed constant tingling and progressive weakness such that she reported dropping things, so she underwent a C6-T2 laminectomy for fenestration of an arachnoid cyst on August 16, 2016, and was admitted to the ICU for close monitoring. (Docket No. 8-15 at ECF p. 9). She was hospitalized until August 25, 2016, and her "pain was difficult to control." Yet, her grip strength was 4/5[1] in both hands and continued to improve. (*Id.*). On August 26, 2016, ten days after her procedure, physiatrist Eric Douglas Aitken examined Maryjane R. and noted decreased range of motion in her cervical spine, but full strength in all extremities. (Docket No. 8-10 at ECF pp. 26, 29). He admitted her to inpatient rehabilitation to address ongoing cervical myelopathy status post C6-T2 laminectomy, where she was eventually discharged on September 1, 2016, having "progressed well," although she "demonstrated significant pain behaviors" during her inpatient stint. (Docket No. 8-10 at ECF pp. 26, 30, 54-55).

A postoperative MRI was taken on October 4, 2016, which showed unchanged appearance of the cystic lesion, more prominent spinal canal spaces after laminectomy at the cervicothoracic junction, and expected postoperative changes with subcutaneous fluid collection. (Docket No. 8-19 at ECF p. 6). On October 19, Maryjane R. presented to her surgeon, Jesse Savage, M.D., for follow-up stating she had "been frustrated since surgery due to her persistent

---

[1] Muscle strength grading is typically on a 5-point scale: 0 is no muscle activation, 1 is trace muscle activation like a twitch, 2 is muscle activation to achieve full range of motion with gravity eliminated, 3 is muscle activation to achieve full range of motion against gravity, 4 is muscle activation to achieve full range of motion against some resistance, and 5 is muscle activation to achieve full range of motion against an examiner's full resistance. Usker Navqi and Andrew Sherman, "Muscle Strength Grading," *StatPearls*, available at the National Library of Medicine, https://www.ncbi.nlm.nih/gov/books/NBK436008/ (last updated 8/29/2022).

back and should pain as well as her weakness. Her weakness ke[pt] her from being able to do some of her ADL's. However, [Maryjane R.] report[ed] that her hand weakness [was] improving." (Docket No. 8-19 at ECF p. 12). She displayed a 3/5 bilateral hand grip strength, but 4+/5 bilateral tricep strength and 5/5 deltoid strength. (*Id.* at ECF p. 13). Dr. Savage planned physical and occupational therapy. (*Id.*).

On December 19, 2016, Maryjane R. followed up with neurosurgery and reported that while she had improved sensation in her hands, she continued to experience weakness in her hands that limited her function. (Docket No. 8-19 at ECF p. 18). On examine Maryjane R. displayed a 4+/5 strength in her right bicep and 4/5 in her bilateral triceps, but only 1/5 strength in grip and finger abduction bilaterally. (*Id.* at ECF p. 19). The examining resident neurosurgeon did not indicate further surgical interventions, but noted Maryjane R. had experienced minimal improvement "in hand,"[2] and opined that she would likely benefit from additional outpatient physical therapy. (*Id.*). She was discharged from the clinic on that date. (*Id.*).

Two months later, on February 12, 2017, Maryjane R. presented to consultative physician Shuyan Wang for an examination. (Docket No. 8-19 at ECF p. 31). Dr. Wang noted Maryjane R.'s incision scar from the lower cervical spine to the upper thoracic spine. Dr. Wang was unable to touch Maryjane R.'s posterior and left neck due to pain, while having no tenderness on the right side. She perceived limited motion in her shoulders and her grip strength was subjectively assessed with "minimal bilateral hands grip strength" due to reported pain in her shoulders; her hands' index finger PIP and DIP joints were extended at 0 degrees at all times; she could flex her

---

[2] The note, which comes from the Assessment & Plan portion, says "[i]mprovement in LE but minimal in hand." (Docket No. 8-19 at ECF p. 19). When read in conjunction with the physical examinations, which rated the same 1/5 grip and finger abduction for both the right and left hand, the reference to "in hand" is reasonably read to refer to both hands.

index MP joint to 30 degrees and could only flex all other finger joints to about 60 to 70 degrees; she was not able to fully close all of her fingers into a fist; she was right-handed and wrote with the right hand, but was only able to hold a pen between her fourth and fifth fingers and her palm; she only used the fourth and fifth fingers of either hand and the thumb tip of the right hand to button, "which seems to be difficult"; she could pick up a folder with her hand; and when looking through her papers, she kept her index fingers straight but could use the other fingers to turn pages without difficulty. (Docket No. 8-19 at ECF p. 33). Dr. Wang's opinion was only limited to the vague conclusion that Maryjane R.'s "upper extremities strength seems to be limited due to pain or weakness." (*Id.* at ECF p. 34).

A nerve conduction study was performed on August 24, 2020. (Docket No. 8-32 at ECF p. 5). A physical examination from the time of testing noted extensive intrinsic muscle atrophy in both hands. (*Id.*). The electrodiagnostic findings indicated mild carpal tunnel syndrome on both hands and bilateral C8 cervical radiculopathy. (Docket No. 8-32 at ECF p. 6).

Maryjane R. attended a consultation with neurosurgeon Karsten Fryburg, M.D., on March 1, 2021, for neck and back pain with "some weakness in both upper extremities," among other issues. (Docket No. 8-34 at ECF p. 2). Dr. Fryburg noted Maryjane R. was working as a parking attendant. (*Id.*). On examination, she had reduced reflexes in her triceps and patella, as well as reduced at 3-4/5 for fingers flexor, 3/5 for wrist extension, and 4/5 for her triceps. (*Id.* at ECF p. 3). However, Dr. Fryburg noted she had motor strength 5/5 in both upper and lower extremities in all muscle groups. (*Id.*). Dr. Fryburg reviewed a November 2020 non-contrast MRI of her cervical spine, although he was unsure whether it indicated merely postoperative changes or actual recurrent disease. (*Id.* at ECF p. 4). Dr. Fryburg planned a contrast MRI of the cervical spine. (*Id.*).

### B.  Hearing Testimony

The ALJ asked the VE about work available for someone limited to sedentary work with several additional physical limitations.[3] Of relevance, those limitations included: frequent handling and fingering with bilateral upper extremities. (Docket No. 8-23 at ECF p. 56-57). The VE said that past work could not be performed but other work as an office clerk (with 57,000 jobs in the national economy), a sorter (with 11,000 jobs in the national economy), and a packer (with 31,000 jobs in the national economy) could be performed. (Docket No. 8-23 at ECF p. 58). The ALJ then adjusted the hypothetical to decrease handling and fingering to an occasional basis, but otherwise maintained the other limitations. The VE said that the positions he supplied would be eliminated, and that "[t]here would only be one occupational base with occasional use of hands, that is surveillance systems monitor. . . . there's only 2,000 positions in the national economy." (*Id.*). He further noted for that position that "individuals [would] have to remain on – on-task at all times while at the workstation, other than any scheduled break periods and a lunch period." (*Id.*).

### IV. ANALYSIS

The Court addresses each of Maryjane R.'s arguments in turn.

### A.  RFC's Handling and Fingering Limitation and State Agency Consultants' Opinions

At the initial and reconsideration stages of Maryjane R.'s claim for disability benefits, state agency medical and psychological experts reviewed her medical records and offered opinions on her claim. In March 2017, B. Whitley, M.D., reviewed the evidence and concluded Maryjane R. was physically able to do light work with additional limitations, including

---

[3] See Section I, *supra* for a full recitation of the ALJ's RFC, which was also presented to the VE within a series of hypotheticals.

occasional handling and fingering. (Docket No. 8-3 at ECF pp. 9-10, 21-22). In July and August 2017, a second set of experts reviewed Maryjane R.'s records. M. Brill, M.D., assessed Maryjane R.'s physical abilities for work and agreed with Dr. Whitley's opinion that Maryjane R. could do work with occasional handling and fingering. (Docket No. 8-3 at ECF pp. 37-38, 51-52). As part of that reconsideration process Maryjane R. reported that on April 20, 2017, she could "now bend [her] pointer fingers to touch [her] thumbs but [her] general mobility is still difficult due to the pain." (Docket No. 8-3 at ECF p. 43).

Ultimately, in assigning an RFC the ALJ found Maryjane R.'s capabilities more limited than the state agency consultants, in the sense that he limited her to a reduced range of sedentary work. But, with respect Maryjane R.'s handling and fingering, he found her less limited than the state agency consultants, finding that she could frequently handle and finger with bilateral upper extremities. (Docket No. 8-22 at ECF p. 34).

Maryjane R. argues that the ultimate RFC was not supported by substantial evidence, namely because she cannot frequently handle and finger with bilateral upper extremities. She argues that Dr. Whitley specifically explained why he limited her to occasional handling and fingering and that the ALJ's reasons for not giving this portion of Dr. Whitley's opinion, affirmed by Dr. Brill, significant weight were faulty, in that he relied on irrelevant negative findings, downplayed positive findings, and assigned too much reliance to her work, interests, and daily activities.

The Commissioner generally argues that, absent the handling and fingering limitation, the ALJ actually assigned a more restrictive RFC than the state agency consultants opined. More specifically, she responds that the ALJ properly weighed the state agency medical experts' finding of handling and fingering limitations against the substantial record evidence, and the

ALJ's explanation for disagreeing with the experts was reasonable. Moreover, the Commissioner argues that while the ALJ considered Maryjane R.'s daily activities, as he is required to do so under 20 C.F.R. § 404.1529(c)(3)(i), the ALJ never equates her daily activities with full time work activity.

On reply, Maryjane R. rebuts the Commissioner's proposition that the ALJ's RFC was more restrictive than the state agency consultant's opinions by pointing out that after "occasional handling and fingering" was added to the sedentary RFC determination, the VE testified that this reduced the available jobs to only allow a single job with 2,000 positions in the national economy. (Docket No. 8-3 at ECF pp. 37-39).

Given this case's lengthy procedural history, the regulations as they existed prior to March 27, 2017, apply here; thus, adjudicators must weigh medical source statements under the rules set out in 20 C.F.R. §§404.1527 and 416.927. Under these rules, "If [the SSA] find[s] that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in your case record, [it] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2); see Scott v. Astrue, 647 F.3d 734, 739 (7th Cir. 2011). Regardless of its source, unless the treating source is given controlling weight under (c)(2), the following factors are considered in deciding what weight to give to any medical opinion: examining relationship, treatment relationship (including length, frequency, and nature/extent of the relationship), supportability, consistency, specialization, and other factors. 20 C.F.R. § 404.1527(c)(1)-(6); see Hofslien v. Barnhart, 439 F.3d 375, 377 (Cir. 2006). "The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion

was not adopted." SSR 96-8p. Nevertheless, the regulations place the responsibility for assessing a claimant's work abilities squarely on the ALJ. 20 C.F.R. § 404.1546(c).

Thus, the issue is whether the ALJ rejected the state agency physicians' opinion limiting Maryjane R. to occasional handling and fingering has sufficient evidentiary basis. *See Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995) (reversing where "the facts on which the administrative law judge relied to contradict [the opinions of a consulting physician] are singly and together unimpressive"). Here, with respect to the medical consultants' limitation that Maryjane R. can only occasionally perform handling and fingering, the ALJ said:

> [this limitation] is likewise not given significant weight, as it does not appear consistent with the medical evidence of record received through the date of the haring. Specifically, the claimant generally demonstrated only mildly reduced grip strength and upper extremity strength, rated as a 4 out of 5 (3F/3; 6F/94, 146, 201). Moreover, the claimant's strength in all other realms was rated as a 5 out of 5, her cranial nerves were intact, and her deep tendon reflexes were within normal limits throughout (3F/3-4; 6F/146, 201). The claimant's sensation was also intact, she did not demonstrate joint swelling, and there were no trigger point/tender points present (3F/3). Additionally, the claimant's motor skills were grossly intact (4F/7, 12, 20, 31; 6F/94). Also, she had no Hoffman's, clonus, or Babinski signs and there were likewise no signs of cerebellar dysfunction (4F/31; 6F/94, 103, 146; 6F/201). Moreover, it was noted that the claimant was independent with activities of daily living, driving, home management, household ambulation, meal preparation, medication management, transfers, and she did not require the use of any assistive equipment at home (5F/107). It was also noted that the claimant enjoyed riding horses, beading, arts and crafts, cooking, and spending time with children and planning activities (5F/107). Moreover, after her August 2016 surgery, she was moving all extremities normally (8F/1). Additionally, she reported a significant improvement in the sensation in her hands (8F/17). Also, the record reveals that the claimant was generally consistently working throughout the period at issue (2F/27; 4F/16, 19; 19F/1). The undersigned notes that the claimant did appear to have only "minimal" bilateral hands grip strength during the consultative examination with Dr. Wang, but that this presentation did not appear consistent with her assessments during appointments with her own providers. Therefore, with respect to her grip strength and upper extremities, the undersigned gives greater weight to the medical records with the claimant's own treatment providers, as discussed above. In consideration of the foregoing discussion, it does not appear that occasional

fingering and handling would be reasonably supported herein and that it appears reasonable that the claimant would be limited to frequent fingering and handling.

(Docket No. 8-22 at ECF pp. 30-31).

The Court acknowledges that "the determination of a claimant's RFC is a matter for the ALJ alone—not a treating or examining doctor—to decide." *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014). Nevertheless, there are a number of issues with the ALJ's opinion that lead the Court to the conclusion that the ALJ was indeed "playing doctor" in this case. First, while the ALJ detailed most of the extensive medical record in this case, including much of the evidence related to Maryjane R.'s hand issues and grip strength, he ultimately discredited much of this evidence and concluded that "the claimant generally demonstrated only mildly reduced grip strength and upper extremity strength." (Docket No. 8-22 at ECF p. 30). I agree with Maryjane R. that it appears the ALJ cherry-picked medical records in this regard. For instance, in February 2014, her neurosurgeon at the time noted slighted reduced reflexes and a minimally positive Hoffman's sign. (Docket No. 8-10 at ECF p. 26; *compare with* Docket No. 8-22 at ECF p. 30 (ALJ stating "she had no Hoffman's")). After her August 2016 of her intramedullary lesion, in October 2016, Maryjane R. had greatly reduced grip strength at only 3/5 (Docket No. 8-19 at ECF p. 14). Two months later she had 1/5 strength in her grip and finger abduction of both hands, even though she only mildly reduced upper extremity strength in her biceps and triceps. (*Id.* at ECF p. 19). This visit was where the examining physician indicated that Maryjane R. only experienced minimal improvement in her hands, which is the note Dr. Whitley cited in limiting Maryjane R. to occasional handling and fingering. (Docket No. 8-3 at ECF p. 10).

Curiously, the evidence the ALJ cites for the proposition that Maryjane R. "generally demonstrated only mildly reduced grip strength and upper extremity strength, rated as a 4 out of

14

5 (3F/3; 6F/94, 146, 201)" all predates her August 2016 fenestration of her intramedullary lesion. (*See* Docket No. 8-10 at ECF p. 25 (December 19, 2013, 4+/5 bil grip strength); Docket No. 8-15 at ECF p. 95 (November 16, 2015, 4/5 bilateral grip strength); Docket No. 8-16 at ECF p. 2 (February 4, 2015, 4/5 bilateral grip strength); Docket No. 8-16 at ECF p. 58 (August 6, 2014, "4/5 RE and 5/5 LUE"). These findings all predate the August 16, 2016, surgery by some time. As noted by Gina Monaco, M.D., Maryjane R.'s upper extremity weakness was "progressive" "especially in her hands." (Docket No. 8-15 at ECF p. 14).

Moreover, a nerve conduction study in August 2020, after the state agency physicians' reviews, did show only mild bilateral carpal tunnel syndrome, but the study also demonstrated bilateral C8 cervical radiculopathy, and physical examination at the time revealed extensive intrinsic muscle atrophy[4] in both hands. (Docket No. 8-32 at ECF pp. 5-6). Maryjane R. saw another neurosurgeon in March 2021, who noted that her motor strength was a 5/5 in all extremities and muscle groups, but that her fingers flexors were a 3-4/5 and her wrist extension was a 3/5. (Docket No. 8-34 at ECF p. 3). These examinations further contradict the ALJ's conclusions that Maryjane R. "demonstrated only mildly reduced grip strength," and that Dr. Wang's "minimal" bilateral hands grip strength finding was inconsistent "with her assessments during appointments with her own providers." (Docket No. 8-22 at ECF pp. 30-31). While the ALJ addressed some of this evidence in his summation of Maryjane R.'s medical evidence (*see* Docket No. 8-22 at ECF p. 24), he does not address her March 2021 fingers flexor and wrist extension ratings, and he fails to mention this evidence altogether when he is discounting the medical consultants' handling and fingering limitation.

---

[4] The muscle atrophy appears to have worsened over the course of the record, given earlier records showed no atrophy. (Docket No. 8-19 at ECF p. 33).

Maryjane R. further argues that the ALJ's decision to give the grip and upper extremity strength findings of "claimant's own treatment providers" "greater weight" than the opinion of consultative examiner Dr. Wang, was nonsensical, given that treatment exam findings are not opinions. For claims filed before March 27, 2017, an ALJ gives "weight" to medical opinions from "acceptable medical sources." *See* 20 C.F.R. § 404.1527. "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [their] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [their] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1). Clinical findings like grip strength are, on the other hand, "objective medical evidence," which is defined by the agency as "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption." 20 C.F.R. § 1529(c)(2). While a factfinder can articulate how an objective medical evidence "is material to other analyses or conclusions in a claim," such as "an analysis of symptoms," this is separate and different from "weighing" objective medical evidence in the way an ALJ "weighs" opinion evidence. In any event, setting aside the significance of categorizing this evidence, the ALJ's discredit to Dr. Wang's finding of only "minimal" bilateral hand grip strength because that finding did not align with Maryjane R.'s providers' findings during the same period overlooks that Dr. Wang's exam came only a couple months after another provider observed only 1/5 strength in Maryjane R.'s hands and that her hands experienced minimal improvement after the fenestration. This cherry-picking of evidence is impermissible. *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013) ("An ALJ cannot rely only on the evidence that supports her opinion.").

The ALJ also relies on findings unrelated to Maryjane R.'s ability to handle and finger, including that her strength "in all other realms was rated as a 5 out of 5 [and] her cranial nerves were intact;" and there were no signs of "cerebellar dysfunction." It is not evident how these findings are related to Maryjane R.'s ability to handle or finger.

Maryjane R. further argues that the ALJ improperly relied on her activities of daily living in rejecting the state agency consultants' handling and fingering limitation. As noted above, the ALJ does recite Maryjane R.'s long list of activities of daily living as support for finding that the medical consultants' limitation that the claimant can only occasionally perform handling and fingering is not given significant weight. But, the regulations specifically allow for ALJs to consider a claimant's activities. 20 C.F.R. § 404.1529(c)(3)(i). And while Maryjane R.'s briefing correctly outlines the Seventh Circuit case law providing guidance as to the misuse of a claimant's ADLs and work attempts (*see* Docket No. 18 at ECF pp. 14-15), the briefing does not apply the case law to the ALJ's decision in the instant case. The reply brief does not address the issue at all. Maryjane R. does not point to any portion of the ALJ's decision that hints at such equivalency and Maryjane R. does not deny that she reported her ADLs included driving, walking, making meals, traveling, and riding horses. But, like the unrelated objective findings, it is not exactly clear how these activities of daily living undermine a finding of occasional handling and fingering, but support a finding of frequently handling and fingering as the ALJ does not bridge the gap in his decision.

The Commissioner relies on two non-precedential cases for the proposition that the ALJ's explanation for disagreeing with the experts was reasonable. Both are distinguishable. In *Cartwright v. Barnhart*, the plaintiff contended that the ALJ erroneously ignored the state agency consultants' finding that the plaintiff was limited to no more than frequent fine and gross

manipulation secondary to bilateral carpal tunnel syndrome. 205 F. App'x 450, 454 (7th Cir. 2006). The Seventh Circuit disagreed, not only because the argument was waived by failing to raise it before the district court, but also because during the contested time period, the medical records of the treating doctors "[did] not include a single mention of an abnormal medical test, course of treatment, or functional limitation with respect to her hands." *Id.* Of course, the record here, as discussed above, does contain abnormal medical tests, courses of treatment, and functional limitations. And, again, the state agency consultants relied on those records in assigning their "occasional" handling and fingering limitation. (Docket No. 8-3 at ECF p. 10).

In *Green v. Astrue*, the pro se Plaintiff raised concerns regarding his RFC assessment, which included light work with a sit or stand option every 30 minutes. No. 3:05-cv-219-RLY-WGH, 2007 WL 1141958, at *6 (S.D. Ind. Mar. 21, 2007). There the Court reviewed the record and noted that while two doctors suggested a weight lifting restriction and sit/stand option that would preclude light work, other evidence in the record supported the ALJ's decision. *Id.* This other evidence included mostly normal physical examinations, relatively conservative treatment, no recommendations for surgery, and state agency physician's evaluations that provided a less limited RFC than the ALJ eventually found. *Id.* Additionally, one of the two doctors' opinions in question was provided in a previous worker's compensation proceeding and, thus, was not controlling under the then-current regulations. *Id.*

As discussed, the only doctors to have considered the question appear to have disagreed with the ALJ's assigned limitations with respect to her fingering and handling. At minimum, the Court is unable to trace the path of the ALJ's reasoning from the medical records to his conclusion, as it is unclear whether the medical records that he cites does indeed support his conclusion and he fails to acknowledge other findings that directly contradict his conclusions.

The remaining reasons he gives to discredit the state agency consultants' opinions does not appear related to Maryjane R.'s ability to handle and finger, at least without further explanation by the ALJ. It is evident that the additional limitation to occasional was more limiting given the vocational expert's testimony that it would reduce the available occupational base to "only" "surveillance systems monitor," with 2,000 positions in the national economy. (Docket No. 8-23 at ECF p. 58). The import of that testimony is interrelated to the next issue. For all these reasons, the Magistrate Judge will recommend remand on this issue.

## B.  "Significant" Number of Jobs

The VE testified that under the hypothetical that the ALJ would ultimately adopt as Maryjane R.'s RFC, that there were a total of 99,000 jobs available in the national economy. (Docket No. 8-23 at ECF p. 58; Docket No. 8-22 at ECF p. 35). These include office clerk (57,000 jobs), sorter (11,000 jobs), and packer (31,000 jobs). (*Id.*). Based on this testimony, the ALJ found that Maryjane R. was capable of making a successful adjustment to other work that exists in significant numbers in the national economy.

Maryjane R. argues that remand is appropriate for further vocational testimony so that the ALJ may more fully assess the availability of jobs in the national economy and, if necessary, clearly articulate his rationale for finding a number of jobs to be significant. She points to the mixed results in the Seventh Circuit regarding what constitutes a "significant" number of jobs. (Docket No. 18 at ECF pp. 20-23).

The Commissioner responds that Maryjane R. forfeited this argument by failing to object to the VE's testimony at the hearing and, forfeiture aside, that the ALJ was entitled to rely on the VE's testimony of the existence of 99,000 to support the ALJ's step five finding that Maryjane R.

could perform a significant number of jobs. The Commissioner argues that Maryjane R. fails to show that the VE's testimony was unreliable or that the ALJ erred in relying on that testimony.

Maryjane R. replies that there is no forfeiture because the error was not in the VE's testimony, but in the ALJ's conclusion that the testimony supported the existence of significant number of jobs, a conclusion that could only be known once the ALJ issued his decision. Maryjane R. reiterates that remand would allow the SSA to produce evidence showing that a fairly small number of jobs available nationally actually translates to a sufficient number of jobs in the region.

After the parties' briefs were complete, the Seventh Circuit issued *Milhem v. Kijakazi*, 52 F.4th 688 (7th Cir. 2022). In that case the vocational expert testified that there were 89,000 jobs in the national economy that the plaintiff could perform, which, based on that testimony and "considering [plaintiff's] age, education, work experience, and residual functional capacity," the ALJ found at step five that there were a significant number of jobs that the plaintiff could perform. *Id.* at 692. Milhem appealed to the district court and then the Seventh Circuit, where she presented three arguments as to why the step-five determination was flawed: (1) that there must be a regulation defining how many jobs are "significant" for a step-five determination to be made; (2) even if "significant" can be defined by adjudication, neither the ALJ nor the Commissioner presented a standard by which significance can be assessed; and (3) 89,000 jobs in the national economy is not a significant number of jobs. *Id.* at 693.

The Seventh Circuit found that Milhem waived the first argument by failing to present it to the district court. *Id.* With respect to the third argument, that the 89,000, jobs was not a significant number of jobs, the Seventh Circuit rejected the Commissioner's waiver argument. *Id.* at 693-694. Like here, the Commissioner argued that Milhem failed to object at the

administrative hearing, but the Seventh Circuit stated Milhem "challenges the ALJ's ultimate finding that the number of jobs available is 'significant' for purposes of the step-five analysis" and not the vocational expert's testimony about the number of jobs she can perform or the bases for those estimates. *Id.* at 694 ("[B]ecause the significance determination was made only after the hearing had concluded, Milhem did not waive her third argument that 89,000 is not a "significant" number of jobs for the purposes of the step-five determination.").

With regards to Milehm's second argument seeking a standard for significance, the Seventh Circuit rejected the argument finding that no statutory and regulatory framework contained such a requirement. *Id.* at 694-695. Moreover, such a standard would not be in accord with the Supreme Court's approach to categorical rules in Social Security hearings. *Id.* Notably, the Seventh Circuit recognized *Biestek*, "the Court rejected an argument that would have established a categorical rule that substantial evidence could not be shown whenever a vocational expert refuses a request for data underlying her job estimates." *Id.* (citing *Biestek v. Berryhill*, 139 S. Ct. 1148, 1157 (2019)).

Finally, the Seventh Circuit addressed Milhem's third argument as to whether the 89,000 national jobs constituted a significant number in her case. *Milhem*, 52 F.4th at 695. The Seventh Circuit acknowledged that the Circuit's case law addressing what constitutes a "significant" number of jobs has sometimes conflated regional versus national jobs and instructed future reviewing courts to "be attentive to the difference between regional and national job numbers in this discussion." *Id.* (collecting cases). Nonetheless, the Seventh Circuit found sufficient evidence supported the ALJ's step-five decision on the instant record. *Id.* It noted that the VE provided the ALJ with plenty of evidence that Milhem could perform 89,000 jobs; that the ALJ grounded her conclusion that the number of jobs was "significant" on her consideration of

Milhem's "age, education, work experience, and residual functional capacity" and that Milhem was "capable of making a successful adjustment to other work that exists" in the economy. *Id.* On the record, the Seventh Circuit concluded that a reasonable person would accept 89,000 jobs in the national economy as being a significant number. Finally, the Seventh Circuit noted that the number was in line with previous Seventh Circuit precedent and other circuit's precedents. *Id.* (citing *Weatherbee v. Astrue*, 649 F.3d 565, 572 (7th Cir. 2011) (140,000 representative jobs in the national economy was "well above the threshold for significance.")) and (collecting cases from the Sixth, Ninth, and Eighth Circuits finding 10,000 to 32,000 jobs, nationally, significant).

Here, Maryjane R. does not dispute the substantive correctness of the vocational expert's testimony—only whether the ALJ had sufficient evidence from that testimony to find her not disabled. The vocational expert provided the ALJ with sufficient evidence that Maryjane R. could perform 89,000 jobs based on the hypothetical that the ALJ gave, which the ALJ ultimately adopted as his RFC. Like in *Milhem*, the ALJ grounded his conclusion that the number of jobs mentioned was "significant" on his consideration of Maryjane R.'s "age, education, work experience, and residual functional capacity" and that Maryjane R. was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (Docket No. 8-22 at ECF p. 35. The ALJ's hypotheticals to the vocational expert revealed that he weighed the testimony presented and determined that Maryjane R. could at least perform the reduced range of sedentary work. While the Court finds remand is necessary on issue one, on this record, a reasonable person would accept 99,000 jobs in the national economy as being a significant number. If, on remand, the ALJ finds additional limitation is necessary, step five will nonetheless have to be reconsidered. *See Milhem*, 52 F.4th 696 (collecting decisions from the Seventh Circuit that have "imprecisely cited" *Liskowitz v. Astrue*, 559 F.3d

736, 743 (7th Cir. 2009) and *Weatherbee*, 649 F.3d at 572 for the proposition that 1,000 jobs in the national, versus regional, economy "meets the threshold of significance").

## V. CONCLUSION

For all these reasons, the Magistrate Judge recommends the court **REVERSE and REMAND** the ALJ's opinion pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration, consistent with this opinion. Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1). Failure to file timely objections within fourteen days after service shall constitute waiver of subsequent review absent a showing of good cause for such failure.

**SO RECOMMENDED** the 30th day of January, 2023.

Matthew P. Brookman
United States Magistrate Judge
Southern District of Indiana

Served electronically on all ECF-registered counsel of record.